IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**JONATHAN McCHRISTON**,

      Plaintiff,

v.                                                           No. 10-CV-243-MCA-WPL

**CITY OF ALBUQUERQUE, CITY
OF ALBUQUERQUE POLICE
DEPARTMENT, and CHIEF OF
POLICE RAY SCHULTZ**,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' *Motion for Summary Judgment*,

filed on May 3, 2011. [Doc. 34]  Having considered the submissions, the relevant case law,

and otherwise being fully advised in the premises, the Court grants in part and denies in part

Defendants' *Motion for Summary Judgment* and remands this case back to state court for

adjudication of Plaintiff's state law breach of contract claim.

**I.**      **BACKGROUND**

Plaintiff Jonathan McChriston is an African-American male and a former employee

of the Defendants, the City of Albuquerque (City) and the Albuquerque Police Department

(APD).  He received his training at the Albuquerque Police Academy from June of 2005

through December 24, 2005 and thereafter was employed as a police officer until he was

terminated from his employment in May of 2007. [Doc. 1-1 Ex. A at 2; Doc. 6 at 2]

During his tenure as an APD officer, Plaintiff was disciplined multiple times. He received a letter of reprimand for taking photographs at the scene of an accident. [Doc. 1-1 Ex. A at 2; Doc. 6 at 2; Doc. 35-1 at 22] He received a forty-hour suspension for "driving at a high rate of speed" while off-duty and having "an attitude during the encounter with officers." [Doc. 35-3, Ex. C, at 2-3] Additionally, he received an eighty-hour suspension and a ninety-day extension of his probationary period for an incident in which he failed to fill out a report in connection with a traffic accident. [Id.; Doc. 36-7, Ex. 5]

Plaintiff proffered evidence revealing that his probationary period was extended nearly two months after he had successfully completed probation and been promoted to the nonprobationary position of "a patrolman first class." [Doc. 36-3, Ex. 1.2; Doc. 36-6 Ex. 4] Plaintiff alleges that the retroactive extension of his probationary period for ninety days violated his employment contract with the City, which only permitted a one time "[e]xtension of the probationary period for a maximum of sixty (60) days," prior to the "[s]atisfactory completion of the probationary period resulting in a change from probationary to nonprobationary." [Doc. 36 at 6-7] See Albuquerque, N.M., Merit System, Personnel Policy § 307.1 (2001). [Doc. 36-8, Ex. 6 at 5]

The record reflects that on March 21, 2007, Plaintiff went to the office of Dr. Nathan Ivey and asked to speak to one of Dr. Ivey's employees, Sabrina Winn. Plaintiff was dressed in slacks, a dress shirt, and a tie and he had his gun and badge visibly displayed on his belt. [Doc. 35-1, Ex. A at 32-53] Plaintiff and Winn went outside into the hallway to talk. Winn recognized Plaintiff as a friend of her ex-boyfriend, Carlos Archuleta, a convicted felon who

2

was out on parole. [Id. at 38, 42]  Archuleta had filed a burglary report against Winn with the Rio Rancho Police Department, because Winn had retrieved some of her belongings from Archuleta's house the previous day when he was not at home.  [Id. at 47]  Plaintiff informed Winn that he was "there to arrange a meeting so . . . Archuleta could get his key back." [Id. at 35, 38, 47]  At some point, Dr. Ivey joined the conversation.  Both Dr. Ivey and Winn later reported that Plaintiff informed them that his visit was on behalf of the Rio Rancho Police Department, which had asked Plaintiff to come over and talk to Winn regarding the incident. [Id. at 35, 38]

After the visit, employees in Dr. Ivey's office observed Plaintiff, who was driving a marked APD cruiser, meet Archuleta in the back of the parking lot.  [Id. at 33-34,36, 39, 41, 48]  The employees reported that, while in the parking lot, Plaintiff called the office on a private line reserved for the friends and family of office employees.  Plaintiff identified himself as "Officer Gill" and asked to speak to Winn. [Id. at 33-34, 36-37]  Dr. Ivey informed Plaintiff that his presence in the parking lot was disruptive and asked him to leave. [Id. at 52-53, 49-53]  After the call ended, both Plaintiff and Archuleta drove away.

The next day, Stacy Chavez, Dr. Ivey's office manager, contacted the Internal Affairs Unit of the APD and reported the incident. [Id. at 3, 32]  Sergeant Mike Miller initiated an investigation, which included an administrative interview with Plaintiff.  During the interview, Plaintiff denied that his badge and gun were visibly displayed at Dr. Ivey's office, that he "ever told anyone he was there at the request of the Rio Rancho Police Department" or "ever represented himself as a police officer," and that he called Dr. Ivey's office from the

3

parking lot.  [Id. at 47]  Instead, Plaintiff maintained that Dr. Ivey's office had called him on his cell phone and had asked him to leave the parking lot.  [Id. at 49]

At the end of the interview, Sergeant Miller afforded Plaintiff an opportunity to clarify the issue of whether his gun and badge had been visibly displayed.  [Id. at 51]  Plaintiff's "representatives asked to go off-the-record so they could speak to [Plaintiff]" privately.  [Id.] After several minutes, Plaintiff and his representatives returned and made "some further statements."  [Id.]  Plaintiff clarified that there was "definitely a strong possibility that his badge and hip holster were exposed" and that "he might have made a call to the office while he was sitting out in the parking lot talking to [Archuleta]."  [Id.]

On the basis of the March 21, 2007 incident, Plaintiff was found to have committed the following violations of the APD's Standard Operating Procedures: (1) untruthfulness; (2) engaging in avoidable contact with a known felon; (3) conducting a criminal investigation without authorization; (4) acting as a representative of the APD without authorization; (5) using an official position or badge for personal gain; (6) permitting personal feelings or friendships to influence decisions; (7) conducting onself in a manner that does not reflect favorably on the APD; (8) conduct unbecoming an officer; (9) failing to furnish a name and employee number when requested; (10) obtaining information outside the scope of official duties; (11) improperly displaying a badge and handgun; (12) responding to minor violations while off-duty; and (13) using an APD vehicle for unofficial purposes.  [Id. at 4-6, 19-22] In light of Plaintiff's "extensive pattern of misconduct . . . within a 12 month period,"

Defendant Raymond D. Schultz, Chief of the APD, recommended termination from employment. [Id. at 18]

On April 18, 2007, Chief Schultz notified Plaintiff "that a pre-disciplinary hearing has been scheduled" for the purpose of giving Plaintiff an "opportunity to provide information in [his] favor relevant to the proposed discipline."  [Id. at 23]  After the pre-disciplinary hearing, Plaintiff was notified that Chief Schultz had "decided to impose termination from employment." [Id. at 27]  The notice informed Plaintiff that

> Under the Merit System Ordinance you may appeal this discipline to the Personnel Board within ten (10) calendar days of the occurrence of the disciplinary decision.  The appeal shall be in writing and shall be submitted to the Chief Administrative Officer with a copy to your department head.  The Chief Administrative Officer shall promptly refer the request to the Personnel Board for a hearing on the matter.

[Id. at 29-30]  Plaintiff did not appeal the disciplinary decision.

Pursuant to Section 10.29.1.11(D) of the New Mexico Law Enforcement Board Administrative Rules, Chief Schultz reported Plaintiff's termination from employment and his history of misconduct to the New Mexico Law Enforcement Academy Training Board (NMLEAT Board). [Doc. 35-3 Ex. C and Doc. 35-4 Ex. D]  As a result, the NMLEAT Board revoked Plaintiff's police officer certification. [Doc. 1-1, Ex. A at 3, Doc. 6 at 4]

On November 29, 2009, Plaintiff filed his *Complaint for Damages* in the Second Judicial District, Bernalillo County, New Mexico.  [Doc. 1-1 Ex. A] The complaint raised five claims: (1) breach of contract; (2) race discrimination in violation of 42 U.S.C. § 1981; (3) deprivation of equal protection of the law in violation of 42 U.S.C. § 1983; (4)

deprivation of a due process liberty interest in violation of § 1983; and (5) deprivation of the right of free speech in violation of § 1983. [Doc. 1-1 Ex. A]  Defendants removed Plaintiff's complaint to this Court on March 17, 2010, based on the existence of federal question jurisdiction. [Doc. 1]  Defendants now move for summary judgment on Plaintiff's complaint, contending that there are no genuine issues of material fact with respect to Plaintiff's claims and that they are entitled to judgment as a matter of law. [Doc. 35]

## II.   STANDARD OF REVIEW

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed. R. Civ. P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.

It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**III.    ANALYSIS**

### A.    Breach of Contract

The complaint alleges that Defendants breached Plaintiff's employment contract by impermissibly extending Plaintiff's probationary status beyond one year, which resulted in the denial of a "termination hearing or progressive discipline procedure." [Doc. 1-1, Ex. A at 5-6]  Defendants contend that they are entitled to summary judgment on Plaintiff's breach of contract claim because Plaintiff was not a probationary employee at the time of his termination, as demonstrated by the fact that Plaintiff received a termination hearing and an opportunity to appeal his termination to the Personnel Board.  [Doc. 35 at 7-10]  In response, Plaintiff concedes that he "was afforded certain steps in progressive discipline," but argues that he did not receive the full panoply of rights to which he was entitled due to his probationary status. [Doc. 36 at 6-7]

In *Defendants' Answer to Plaintiff's Complaint for Damages*, Defendants admitted that "Plaintiff was placed on a one year extended probationary period" and that Plaintiff "was a probationary officer through his employment." [Doc. 6 at 3]  Defendants also admitted that

"Plaintiff was not allowed any disciplinary appeal or hearing rights because of his probationary status" and that "[b]ecause of his probationary status, Plaintiff was not granted a grievance procedure and was denied the progressive discipline procedure in the Defendant's Handbook and Policies and Procedures."   [Doc. 1-1 at 5; Doc. 6 at 5] Defendants further averred that, "as a probationary employee, [Plaintiff] did not have [the] right to appeal his termination." [Doc. 6 at 4]

"Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout [the] litigation."  Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 578 (2d Cir. 2006).  Judicial admissions "have the effect of withdrawing a fact from contention."  Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995) (internal quotation marks and citation omitted.)  A judicial admission is conclusive, unless the Court permits it to be withdrawn.  Id.  Pursuant to Fed. R. Civ. P. 15(a)(2), a judicial admission in a defendant's answer may be withdrawn only "with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."

In this case, Defendants have not sought leave to amend their answer to Plaintiff's complaint.  Accordingly, Defendants are bound by their admission that Plaintiff was a probationary employee, who was neither entitled to nor afforded the grievance procedures delineated in the Merit System Ordinance.  See Merit System, Personnel Policy § 305 ("An employee serving in a probationary period is not entitled to certain rights and benefits as provided for in other sections of the Personnel Rules and Regulations."). [Doc. 36-8, Ex. 6

8

at 2]  In light of Defendants' admission, the Court must determine whether Defendants breached Plaintiff's employment contract by extending his probationary period.

To prevail on his breach of contract claim, Plaintiff must demonstrate "the existence of a contract, breach thereof, causation, and actual damage."  Camino Real Mobile Home Park P'ship v. Wolfe, 891 P.2d 1190, 1199 (N.M. 1995).  Defendants do not dispute that the Merit System Ordinance constitutes an employment contract.  See Collado v. City of Albuquerque, 45 P.3d 73, 76 (N.M. App. 2002) (affirming the trial court, which held that "the City's Merit System Ordinance, together with its personnel rules, constituted an employment contract between Plaintiff and the City"); see also Garcia v. Middle Rio Grande Conservancy Dist., 918 P.2d 7, 10 (N.M. 1996) (holding that an implied employment contract "may be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct") (internal quotation marks, emphasis, and citation omitted)).  Rather, Defendants contend that the extension of Plaintiff's probationary period "is simply not a breach, as it is allowed for a maximum of 60 days under the Merit System Ordinance." [Doc. 35 at 9]

Under the Merit System Ordinance, the probationary period for a police officer is twelve months "immediately following the original appointment date or from the date of graduation from the police academy . . . whichever is later."  Merit System, Personnel Policy § 305. [Doc. 36-8, Ex. 6 at 1]  Plaintiff alleged in his complaint, and Defendants admitted in their answer, that Plaintiff completed the police academy on December 24, 2005. [Doc. 1-1 Ex. A at 2, Doc. 6 at 2]  Plaintiff submitted evidence demonstrating that twelve months later,

9

on December 24, 2006, he successfully "completed probation" and was promoted to the non-probationary position of "a patrolman first class."  [Doc. 36-3, Ex. 1.2; Doc. 36-6 Ex. 4]  However, by letter dated February 16, 2007, Plaintiff was informed that his probationary status had been extended for ninety days. [Doc. 36-7, Ex. 5]  Plaintiff argues that this ninety-day extension of his probationary period violated the Merit System Ordinance. [Doc. 36 at 6]

Section 305 of the Merit System Ordinance provides that

The respective department director will document the completion of the probationary period by submitting a personnel action form and a performance evaluation.  Failure to submit the personnel action form shall constitute dismissal of the employee.  Upon the supervisor's recommendation, the department director may extend the probationary period, one time, for up to a maximum of sixty (60) days.

Merit System, Personnel Policy § 305. [Doc. 36-8, Ex. 6 at 1-2] Section 307.1 provides that

Within fifteen (15) work days before an employee is due to complete the probationary period the department director must submit to the Human Resources Department a performance evaluation and a personnel action form, with an effective date, indicating a change in status of the employee as follows:
A.    Satisfactory completion of the probationary period resulting in a change in probation from probationary to nonprobationary; or
B.    Extension of the probationary period for a maximum of sixty (60) days, such extension may only be requested one time; or
C.    Termination of the probationary employee.

Id. § 307.1. [Doc. 36-8, Ex. 6 at 4-5]

Sections 305 and 307.1 of the Merit System Ordinance do not authorize the extension of a probationary period after the "[s]atisfactory completion of the probationary period resulting in a change in probation from probationary to nonprobationary."  Id.; see City of

10

Albuquerque v. AFSCME Council 18 ex rel. Puccini, 249 P.3d 510, 514 (N.M. App. 2011) (noting that "a non-probationary employee's probationary period could not be extended" under the Merit System Ordinance).  Even if such an extension was authorized, the length of the extension plainly is limited to "a maximum of sixty (60) days."  Id.  This distinction is important because the incident that prompted Plaintiff's termination occurred on March 21, 2007, more than sixty, but less than ninety, days after the date on which Plaintiff's twelve-month probationary period ended.

Defendants argue that they nonetheless are entitled to summary judgment because it is undisputed that Plaintiff actually received a termination hearing and an opportunity to appeal his termination.  [Doc. 37 at 5-6; See Doc. 36-2, Ex. 1.1 at 3].  However, as previously explained, Defendants' answer admitted that "[b]ecause of Plaintiff's probationary status, Plaintiff was not granted a grievance procedure" and "was not allowed any disciplinary appeal or hearing rights."  [Doc. 1-1, Ex. A at 5; Doc. 6 at 6 at 5]  Judicial admissions "are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage by contradictory affidavit testimony or other evidence in the summary judgment record."  In re Carney, 258 F.3d 415, 420 (5th Cir. 2001).  Defendants' motion for summary judgment on Plaintiff's breach of contract claim is therefore denied.

   B.   *Race Discrimination*

Defendants contend that they are entitled to summary judgment on Plaintiff's race discrimination claim because "there is no evidence to show that [Plaintiff] was discriminated against on the basis of his race by his termination." [Doc. 35 at 10]  Plaintiff responds that

racial discrimination may be inferred based on "a chain of events that start with racially offensive comments made by a drill instructor while the Plaintiff was in the police academy to the ultimate termination of the Plaintiff."  [Doc. 36 at 8]

"Section 1981 forbids all intentional racial discrimination in the making or enforcement of private or public contracts.  In particular, § 1981 protects employees from racial discrimination both in entering into an employment contract and in enjoying the benefits, privileges, terms and conditions of employment."  Exum v. United States Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004) (citations omitted).

"A plaintiff alleging discrimination may prove her case by direct or circumstantial evidence. Direct evidence is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status."  Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008) (citation omitted).   In the absence of direct evidence, a plaintiff may prove discrimination circumstantially under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Id.

> Under the McDonnell Douglas framework, the plaintiff must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. Once the plaintiff has established a prima facie case, [t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action. If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

Kendrick v. Penske Transp. Serv., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (internal quotation marks and citations omitted) (alteration in original).

I.       *Direct Evidence*

"When direct evidence is presented, <u>McDonnell Douglas</u>'s burden-shifting scheme is inapplicable.  In such a case, [the court asks] only whether the plaintiff's direct evidence is sufficient to create a genuine issue of material fact to defeat summary judgment."  <u>Fischer v. Forestwood Co., Inc.</u>, 525 F.3d 972, 983 (10th Cir. 2008) (citation omitted).

"Statements showing an existing policy which itself constitutes discrimination are direct evidence of discrimination."  <u>Heim v. State of Utah</u>, 8 F.3d 1541, 1546 (10th Cir. 1993) (internal quotation marks and citation omitted).  "In contrast, an offer of . . . discriminatory statements, from which it was argued that the determining cause of an employment decision might be inferred, [is] not direct evidence of causation on the employment decision."  <u>Id.</u> at 1546-47 (internal quotation marks and citation omitted) (alteration in original); <u>see Stone v. Autoliv ASP, Inc.</u>, 210 F.3d 1132, 1135-36 (10th Cir. 2000) (holding that a supervisor's statements that "at [Plaintiff's] age, it would be difficult to train for another position" or "difficult to find a new job" was not direct evidence of age discrimination); <u>Perry v. Woodward</u>, 199 F.3d 1126, 1134-35 (10th Cir. 1999) (holding that a supervisor's discriminatory statements about "Mexicans smell[ing] bad" and "dirty Mexican[s]" did not constitute direct evidence of racial discrimination); <u>Ramsey v. City and County of Denver</u>, 907 F.2d 1004, 1008 (10th Cir. 1990) (holding that a director's testimony "that certain jobs were more suitable for women than others" was not direct evidence of gender discrimination).  To constitute direct evidence, "the plaintiff must demonstrate a nexus exists between [the] allegedly discriminatory statements" and the adverse employment

action.  Perry, 199 F.3d at 1135 (internal quotation marks and citation omitted) (alteration in original).

In this case Plaintiff testified by deposition that Madrid Otero, a training officer at the police academy, frequently told Plaintiff to "move your Black ass" and "keep your Black lips shut." [Doc. 36-1 Ex. 1 at 1]  Although these comments certainly are discriminatory, there is no evidence proffered to indicate that Otero was involved in the adverse employment actions at issue in this case (i.e. the extension of Plaintiff's probationary status and his subsequent termination).  Moreover, Otero's comments do not demonstrate that the APD had a policy of racial discrimination.  Because there is no causal nexus between Otero's presumably racist comments and the alleged adverse employment actions at issue in this case, the Court concludes that these comments do not constitute direct evidence of racial discrimination.  Plaintiff's racial discrimination claim must necessarily be analyzed under McDonnell Douglas's burden shifting framework.

### ii.  *Circumstantial Evidence*

"[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged."  Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005).  In this case, Plaintiff's racial discrimination claim is based on his extended probationary status and his termination from employment. [Doc 1-1 at 5]  To establish a prima facie case of racial discrimination under these circumstances, Plaintiff must demonstrate that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under

circumstances giving rise to an inference of discrimination.  E.E.O.C. v. PVNF, L.L.C., 487

F.3d 790, 800 (10th Cir. 2007).  This Court observes that there is some tension in the law of

our Tenth Circuit regarding the third element, namely, whether circumstances suggestive of

discrimination, "including alleged misconduct of the plaintiff," is part of the plaintiff's prima

facie case or "part of the analytically subsequent inquiry into the employer's stated basis for

the adverse action and the plaintiff's opposing demonstration of pretext."  Sorbo v. United

Parcel Serv., 432 F.3d 1169, 1173 n.5 (10th Cir. 2005) (citing cases); see also E.E.O.C., 487

F.3d at 800 n.5.  Regardless of whether the Court analyzes Plaintiff's "evidence 'in reference

to the prima facie case or the business justification versus pretext inquiry, . . . if the court

correctly concludes that the evidence of discrimination/pretext fails as a matter of law,

summary judgment for the defendant is the proper result.'"  E.E.O.C., 487 F.3d at 800 n.5

(quoting Sorbo, 432 F.3d at 1173 n.5).

Defendants admit that Plaintiff belongs to a protected class and that he suffered an

adverse employment action, insofar as his termination is concerned.  [Doc. 5 at 3, 5, Doc. 6

at 3, 5] They contend, however, that Plaintiff cannot prove racial discrimination "because his

work performance was not satisfactory, having an extensive disciplinary history, and being

terminated for serious misconduct." [Doc. 35 at 11-12]  Assuming without deciding that

Plaintiff has established a prima facie case of race discrimination, this Court concludes that

Defendants have proffered race neutral reasons for the alleged discriminatory acts.  The

evidence reveals that Plaintiff was placed on extended probationary status because he was

found to have violated the APD's Standard Operating Procedures by (1) failing "to

accomplish the functions of the department intelligently and efficiently" and (2) failing to investigate a traffic accident and submit a report. [Doc. 36-7, Ex. 5 at 1]  He was terminated from his employment because he was found to have violated thirteen of the APD's Standard Operating Procedures, including untruthfulness and conduct unbecoming an officer, by visiting Dr. Ivey's office on behalf of a convicted felon. [Doc. 35-1, Ex. A]

The burden therefore shifts to Plaintiff to show that Defendants' race neutral explanations are pretextual.

> A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence that the employer did not act for the asserted non-discriminatory reasons.  A challenge of pretext, however, requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee.  Thus, [t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.

Sarkar v. McCallin, 636 F.3d 572, 576 (10th Cir. 2011) (internal quotation marks and citations omitted) (alteration in original).

Plaintiff contends that Defendants' race neutral explanations are pretextual because other officers who engaged in similar misconduct "were either not disciplined or were subject to a much lower form of discipline."  [Doc. 36 at 8]  To prevail on this claim, Plaintiff must establish that he "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."  Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1116-17 (10th Cir. 2007) (internal quotation marks and citation

omitted). Plaintiff has failed to proffer any evidence of similarly situated APD officers who violated work rules of comparable seriousness, but were treated differently than Plaintiff. With respect to the termination, Plaintiff admitted in his deposition that there "was nobody that [he] knew of who was charged with that conduct of abusing his authority as a police officer that had a different kind of discipline." [Doc. 36-3, Ex. 1.2 at 3] With respect to his extended probationary period, there is no evidence to indicate whether, and under what circumstances, other APD officers had their probationary periods extended. He testified that other cadets in his training class were stopped for speeding during the same time period in which he was disciplined for speeding, [Id. at 3] but there is no evidence proffered regarding the circumstances surrounding these other incidents. It therefore cannot be determined to what extent the other cadets were similarly situated, to what extent their violations may have been of comparable seriousness, and whether a different kind of discipline was imposed. [Doc. 35-3, Ex. C at 2] To the extent that Plaintiff relies on Otero's racially discriminatory comments to establish pretext, the Court notes that "isolated racial comments are insufficient to establish pretext unless they can somehow be tied to the employment actions disputed in the case at hand." E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 489 (10th Cir. 2006) (internal quotation marks and citation omitted). As previously explained, no evidence has been proffered which would establish a nexus between Otero's discriminatory comments and the adverse employment actions specifically at issue in this case. Plaintiff has failed to establish that Defendants' race neutral explanations are

pretextual.  Defendants' motion for summary judgment on Plaintiff's race discrimination claim is granted.

<u>C.</u>      <u>*Equal Protection*</u>

Defendants next argue that Plaintiff "has failed to raise a disputed issue of material fact on his equal protection claim" because "there is no evidence in the record of other similarly situated officers." [Doc. 35 at 14]  Plaintiff responds that he has shown "numerous example[s]" of disparate treatment, including evidence indicating that other cadets were not disciplined for speeding and that Plaintiff's probationary period was extended in violation of the Merit System Ordinance. [Doc. 36 at 12-13]

The Fourteenth Amendment guarantee of equal protection "is essentially a direction that all persons similarly situated should be treated alike."  <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985).  "To sustain a claim under the Equal Protection Clause, a plaintiff must provide evidence that he was treated differently from others who are similarly situated to him, and that the act forming the basis of the plaintiff's claim were motivated by a discriminatory purpose."  <u>Marshall v. Columbia Lea Reg'l Hosp.</u>, 345 F.3d 1157, 1179 (10th Cir. 2003); <u>see Barney v. Pulsipher</u>, 143 F.3d 1299, 1312 (10th Cir. 1998) (holding that the trial court properly had rendered summary judgment on a gender discrimination claim asserted by female inmates because the plaintiffs failed to produce evidence regarding the treatment of similarly situated male inmates).

As previously explained, Plaintiff has failed to produce any evidence that he was treated differently than similarly situated APD officers who violated work rules of

comparable seriousness.  Although he produced evidence indicating that his probationary period was extended in violation of the Merit System Ordinance, without evidence of differential treatment it cannot reasonably be inferred that this extension was motivated by a discriminatory purpose.  Defendants' motion for summary judgment on Plaintiff's equal protection claim is granted.

D.     *Due Process Liberty Interest*

Plaintiff alleged in his complaint that Defendants deprived him of his due process liberty interest in his police certification by releasing "defamatory and false statements of wrongdoing regarding Plaintiff to the public."  [Doc. 1-1, Ex. A at 7]  Defendants seek summary judgment on this claim, asserting that the letter submitted to the NMLEAT Board "stated true information" and was "never published . . . beyond [the City of Albuquerque's] own record keeping." [Doc. 35 at 16]  Plaintiff responds that the report "contained facts that have not yet been proven and had been shown to have differing testimony" and that the letter was published because it "went to a third party not affiliated with" Defendants. [Doc. 36 at 13]

To establish the deprivation of a due process liberty interest, Plaintiff must satisfy the following:

> First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published.

19

Renaud v. Wyoming Dep't of Family Serv., 203 F.3d 723, 727 (10th Cir. 2000) (quoting

Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994)).   "These elements are not

disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest."

Workman, 32 F.3d at 481.

Turning to the fourth prong of the Workman test, it is well established that

"intra-governmental dissemination, by itself, falls short of the Supreme Court's notion of

publication: to be made public." Asbill v. Hous. Auth. of Choctaw Nation, 726 F.2d 1499,

1503 (10th Cir. 1984) (internal quotation marks and citation omitted); see Harris v. Blake,

798 F.2d 419, 422 n.2 (10th Cir. 1986) (rejecting the plaintiff's liberty interest claim because

there was no evidence that an allegedly stigmatizing letter placed in the plaintiff student's

academic file had been disseminated to anyone not connected with the university); Lollis v.

City of Eufaula, 249 Fed.Appx. 20, 25 (10th Cir. 2007) (rejecting the plaintiff's liberty

interest claim because "[t]here is no evidence that the Defendants caused the information

contained in the Checotah officers' statements or the reprimand to be published outside the

Police Department or City Council, as is required to establish his claim"); McCarty v. City

of Bartlesville, 8 Fed.Appx. 867, 874 (10th Cir. 2001) (rejecting the plaintiffs' liberty interest

claim because the chief of police's discussion of a criminal information with the district

attorney did not constitute publication).   "Instead, the courts look for evidence of a public

pronouncement of stigmatizing statements."   Isengard v. New Mexico Public Educ. Dep't,

708 F.Supp.2d 1190, 1204 (D.N.M. 2009) (internal quotation marks omitted) (holding that

"it is not reasonable to hold, nor does the case law suggest, that a governmental officer

should be held liable for communicating necessary information to the internal membership of a governmentally created and controlled group").

In this case, Defendants communicated the allegedly stigmatizing information to the NMLEAT Board, an agency which oversees the certification of police officers. [Doc. 35-3, Ex. C] See NMSA 1978, § 29-7-4(G)(1) (2003) (providing that the NMLEAT Board may "issue, grant, deny, renew, suspend or revoke a . . . peace officer's certification for any cause set forth in the provisions of the Law Enforcement Training Act); 10.29.1.11(B)(4) NMAC ("The following conduct by a certified police officer may constitute grounds for denial, suspension or revocation of certification under this rule . . .committing acts which indicate a lack of good moral character, or which constitute dishonesty or fraud, and which adversely affect an officers ability to exercise his or her duties as a certified law enforcement officer."). [Doc. 35-4 Ex. D]  Although the Tenth Circuit Court of Appeals has not directly addressed whether an agency created by state statute "should be considered a governmental agency for the purpose of intra-governmental dissemination," the district of New Mexico has addressed this question.  See Isengard, 708 F.Supp.2d at 1205.  In Isengard, the Court concluded that the New Mexico State Independent Living Council (SILC) was a governmental entity because:

> The SILC is funded by the government and performs an important government function. According to Isengard, federal law mandates that the membership of the SILC include representatives of [the New Mexico Public Education Department's Division of Vocational Rehabilitation], representatives from the Commission of the Blind, representatives from other state agencies that provide services for individuals with disabilities, a Center for Independent Living director chosen by other Center for Independent Living directors in the

state, a Native American Rehabilitation program director, and voting members who are persons with disabilities. See Isengard St. ¶ 16 at 14. The Governor of New Mexico appoints the SILC members. See Pl. Response Exhibit 12 at 32, SILC Mission Statement. The membership itself has a largely overlapping identity with the state government. Additionally, the SILC conducts their meetings in accordance with the New Mexico Open Meetings Act, NMSA 1978 § 10-15-1 to-4, which governs the activities of "any board, commission, administrative adjudicatory body, or other policymaking body of any state agency, any agency or authority of any county, municipality, district, or any political subdivision." See Deposition of Gary Beene at 7 (taken Mar. 30, 2009), filed June 18, 2009 (Doc. 78-2)("Beene Depo."). SILC members are paid pursuant to the New Mexico Per Diem and Mileage Act, NMSA 1978 §§ 10-8-1 to -8, which establishes "rates for reimbursement for travel for public officers and employees." NMSA 1978 § 10-8-1; See Beene Depo. at 6.

Id. 1205-1206.

Like the SILC, the NMLEAT Board is funded by the government and performs an important governmental function.  The Board is composed of the attorney general, "who shall serve automatically by reason of his office and serve as chairman of the board," and eight members appointed by the governor and confirmed by the senate.  NMSA 1978, § 29-7-3(B), (C) (1994).  "At all times, the board shall have represented on it, as members, one municipal police chief, one sheriff, one state police officer, one district attorney, one certified police chief of a New Mexico Indian tribe or pueblo, one certified New Mexico police officer holding the rank of sergeant or below and two citizen-at-large members." Id.  The NMLEAT Board conducts its meetings in accordance with the New Mexico Open Meetings Act, NMSA 1978 §§ 10-15-1 to-4 (2009), and its members are paid in accordance with the New Mexico Per Diem and Mileage Act, NMSA 1978 §§ 10-8-1 to -8 (2009).  See § 29-7-3(D) (per diem)

and 10.29.1.9 NMAC (open meetings).  This Court concludes that the NMLEAT Board is a governmental entity for the purposes of intra-governmental disseminations.

Because the communication at issue in this case was intra-governmental, and there is no evidence to indicate that the May 29, 2007 letter to the NMLEAT Board was disseminated or otherwise made available to the public, this Court concludes that Plaintiff has failed to satisfy the fourth prong of the <u>Workman</u> test.  Defendants' motion for summary judgment with respect to Plaintiff's liberty interest claim is granted.

<u>E.</u>      <u>Retaliation for Plaintiff's Exercise of First Amendment Rights</u>

Plaintiff alleged in his complaint that he was terminated from his employment, "in part, because he reported [his] racial allegations to the Defendant and to outside private and federal governmental entities." [Doc. 1-1, Ex. A at 7]  Defendants move for summary judgment on this claim, alleging that "Plaintiff cannot show a causal connection between any protected opposition to discrimination he made and his termination from APD." [Doc. 35 at 17]  Plaintiff responds that causation can be inferred based on the temporal proximity between his complaints to the Federal Bureau of Investigation (FBI) and the National Association for the Advancement of Colored People (NAACP) and Defendants' adverse employment actions. [Doc. 36 at 13]

"To prevail on a claim of retaliation in the free speech context, the employee must establish (1) the speech involved a matter of public concern; (2) the employee's interest in engaging in the speech outweighed the employer's interest in regulating the speech, and (3) the speech was a 'substantial motivating factor' behind the employer's decision to take an

adverse employment action against the employee." <u>Maestas v. Segura</u>, 416 F.3d 1182, 1187 (10th Cir. 2005). "Under the third factor, the employee has the initial burden of establishing causation–that is, to show the exercise of constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." <u>Id.</u> at 1188. The employee need not prove "but-for" causation, that is, "demonstrate but-for the employee's speech the subsequent employment action would not have occurred." <u>Id.</u> "Rather, the employee must show the protected speech *played a substantial part* in the employer's decision to adversely alter the employee's conditions of employment." <u>Id.</u> (emphasis in original).

"An employer's knowledge of the protected speech, together with *close* temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." <u>Id.</u> at 1189 (emphasis in original). However, "one cannot infer causation from temporal proximity alone when the time lapse between the protected activity and the retaliatory act exceeds three months." <u>Lauck v. Campbell County</u>, 627 F.3d 805, 815 (10th Cir. 2010); <u>see Meiners v. Univ. of Kansas</u>, 359 F.3d 1222, 1231 (10th Cir. 2004) ("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.").

There is no evidence in the record reflecting when Plaintiff's complaints to the FBI and the NAACP were filed or when Defendants acquired knowledge of these complaints. As such, Plaintiff has failed to fulfill his burden to prove causation based on the close

temporal proximity between his protected speech and his termination from employment. Defendants' motion for summary judgment on Plaintiff's first amendment retaliation claim is granted.

### F.    Supplemental Jurisdiction

Having addressed Plaintiff's federal claims, the Court addresses whether to exercise supplemental jurisdiction over Plaintiff's state law breach of contract claim. "The district court has discretion to try state claims in the absence of any triable federal claims; however, that discretion should be exercised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." Thatcher Enter. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). "If the federal claim is dismissed before trial, even though not insubstantial in the jurisdictional sense, the state law claim will generally be dismissed as well." Id.; see 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim [if] . . . the district court has dismissed all claims over which it has original jurisdiction . . ."). This is because "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." Thatcher Enter., 902 F.2d at 1478.

This case is in an early stage of litigation and, therefore, a remand to state court will not adversely affect convenience or judicial economy. Additionally, notions of comity and federalism "point toward declining to exercise jurisdiction over the remaining state-law claim[]." Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988) (recognizing

that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). This Court declines to exercise supplemental jurisdiction over Plaintiff's state law breach of contract claim and remands this case back to state court. See Id. at 352 ("[D]istrict courts [have] discretion to remand, as well as to dismiss, removed pendent claims."); 28 U.S.C. 1441 § (c) (noting that the district court has the discretion to "remand all matters in which State law predominates"); see also 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's racial discrimination, equal protection, liberty interest, and first amendment retaliation claims, and is denied with respect to Plaintiff's breach of contract claim. The Court declines to exercise supplemental jurisdiction over Plaintiff's breach of contract claim and, therefore, remands this case back to the Second Judicial District, Bernalillo County, New Mexico.

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that this case is remanded back to the Second Judicial District, Bernalillo County, New Mexico.

**SO ORDERED** this 28th day of July, 2011, in Albuquerque, New Mexico.


M. CHRISTINA ARMIJO
United States District Judge